Oral argument not to exceed 15 minutes per side. Mr. McCarthy for the appellate. Good morning. I have reserved 5 minutes for rebuttal. You may. May it please the court, I have two main concerns about the lower court's decision that I want to address today. One for each of the two prongs. The two prongs of the lower court's decision.  The first main concern is that under the first Greeno prong, the court didn't really make the sort of historical analysis that this court required in Greeno. The lower court did note that the historical evidence was inconclusive about what the scope of the Second Amendment was in relation to this case. And the court should have just stopped there. This court had stated in Greeno that the next thing to do is to move to the second Greeno prong. That's because if it's uncertain, then you don't have an exclusion from the reach of the Second Amendment. Yes, your honor. Where the court was in error was by turning to two sources that weren't dealing with the historical scope. One was the Supreme Court's decision in Heller. And in Heller, the Supreme Court had explicitly stated it wasn't making an exhaustive historical analysis of the Second Amendment scope. That case was focused on the right to self-defense. Now, certainly the court did say that the long-standing prohibitions on possession of firearms for the mentally ill are presumptively lawful. And we certainly don't want to tell this court not to listen to the Supreme Court. Please do. What I am saying, though, is that the court also said it wasn't making an analysis about the historical scope. And so on this issue, I'd say take the Supreme Court by its word. As far as the specific first prong of Greeno, it could be definitely more relevant to the second prong, but the first prong with the historical scope, the Supreme Court said it wasn't making that analysis. The second way that the lower court erred under the first prong was that it resorted to a modern statute for a definition. 18 U.S.C. 922-G4 is a 20th century statute, and it provides very little, if any, relevant information about what in 1791 the definition of mentally ill was. It may be that this is something that the Congress wanted to define it as. I would say that it wasn't. I'm trying to do that. Counsel, let me ask you on that, because in a practical kind of way, most of us, or at least I would say, that somebody who was hospitalized 30 years ago, 40 years ago, in the circumstance of your client, potentially, if the facts are correct, which we don't know, haven't been tried, be hard to say they're mentally ill today. But somebody else who's in the same legal situation got out of an institution last week after his fourth hospitalization this year for paranoid schizophrenia. You would say maybe he is. So where does that leave us in terms of not only making a ruling for your client, if we were to, but making a ruling that applies across the board? What happens in the real world if we rule in your favor? Certainly, Your Honor. The government has a very important interest. We don't want to be allowing everybody who's been involuntarily committed to have their firearms back. And we definitely don't want to say anything that's any sort of a facial challenge. We're not making that. What we do think is that this court could narrowly tailor things to this fact, the facts of this case. And that's what we're trying to do, is make it an as-applied challenge to this case. What I think there's a few things that in its ruling the court could do to help the court's concerns. One is that this ruling wouldn't be anything that someone could use to challenge commitment being as a trigger for this sort of bar. If you have been involuntarily committed, then that can trigger this firearm prohibition. And it should. It makes sense. It makes sense, given that some people may be suffering by a short-term depression, and some other people may have longstanding. But practically, then, are you saying that if we were to reverse here, what would then happen? The government could come in if they wished and say, no, your facts are wrong. Your client is still mentally ill. And anybody else out there in Michigan or in any state that didn't have a program could file the same kind of suit, and the government could make the same kind of defense. Would that be your position, or how would you state it? Yes, Your Honor. I think that, one, if it's a state such as Kentucky or Illinois that has the state ATF-approved programs, then they should be going through those programs. There's no need to be going before a district court. If the program that's outlined in the federal statute were operative, would you have a viable constitutional challenge? Or one of the state programs? Yeah, I think that, honestly, if one of those state programs was there for him to use, I don't think we would be able to make this challenge today. I think that this rests on the fact that he has no other avenue for relief. Well, to put it in even more practical terms, you would be suggesting, then, that if we found the overbreadth, shall we say, of 922G4 to be a problem, then we would remand to permit the sort of analysis that Judge Boggs suggested, to permit the government to make whatever showing it could make with respect to your client? Yes, Your Honor. So, basically, you'd have kind of a judicial proceeding replacing what the statute would provide as an administrative one. Right. In absence of some other way forward, what I would suggest is that my client was placed in this status because there was clear and convincing evidence, it was 30 years ago, that he was a risk to himself. So what I would say is that he should bear the burden now and do it by clear and convincing evidence. If that's what put him in this position, then that's what he should use to get out of it. Now, if he can do that, and I'm hardly doing my client that much of a favor by saying give him a clear and convincing evidence burden, but if he can do that, then the federal government should certainly have a chance to try to rebut that. But if he can convince the district court that, you know. So he would have the burden in the first instance that he was not to show that he was not mentally ill? Right, Your Honor. I think that given the government's valid concerns here, the best way is to give my client, he's going to need to bear the burden of convincing the court. So it's going to be shoved into the courts instead of an administrative procedure, as the case of certain states allow, I suppose, is what you're talking about? Yeah, Your Honor, I think that the best way would be if there was another avenue, but in a position like this where he has nowhere else to turn, you know, that's when I think that the district court could step in and provide the only available relief that he could otherwise be afforded. What is the standard in either the non-operative federal program or the operative state programs? Is it as strong, as clear, and convincing? You know, Your Honor, I cannot recall for sure off the top of my head. I don't think it was specifically that. If I remember, it was more of there were panels of doctors that would review, and they would make a determination whether they thought someone was at risk. I don't remember there being a judicial standard of clear and convincing evidence in that. I didn't think so either, but I just wanted to see if you had studied more deeply than I. Who would they be suing in the federal courts? Would they sue the state authority or something, the governor or the general or something? You know, I think that especially since you've got what's a federal law being enforced at the state level, you know, they're asking for these permits from the county sheriff. So I think certainly the federal government needs to be involved, and you're going to need to perhaps tag along the local sheriff, which is what we've done in this case. They don't really have much to say, and we don't really have an issue with them. They're just trying to enforce the law. But really it's with the federal government that would be the main opponent to this case. Judge Gibbons had a question. Well, it just sounds to me like looking at the language of the statute. If one were applying the statute, it's probably a preponderance of the evidence standard. I don't know that there would be a reason for the court to adopt the statutory standard, but I think it's probably not clear and convincing. Would you agree with that? I would certainly believe that, you know, it could be done for less than clear and convincing if really the court is convinced that this person is not a risk, then okay, it should be able to proceed forward. My only thought was, you know, if the court is concerned about this, you know, then the original order 30 years ago was based on clear and convincing. That gives you something, but otherwise. Also, how does this implicate, if at all, sort of the ATF forms for purchasing a firearm? Is there something on those forms where you have to admit that you had been committed at some previous time? There is, Your Honor. You do need to do that. Now, there's also a my understanding is that the local county then contacts ATF either through electronically or by phone. They've got a hotline. And this is where the big issue comes is that if the federal database says that they are federally barred, then the county is tied. And that would basically be the big thing is make sure that database. I also think your time has expired. You have your five minutes for rebuttal. Any other questions? Okay, thank you. Thank you. Good morning, Your Honors. May it please the Court, Anisha Desgupta for the appellee. The government's understanding here is that plaintiff's position is foreclosed by Heller. In Heller, the Supreme Court noted that nothing in its analysis should be taken to cast doubt on longstanding prohibitions on firearm possession by the mentally ill. Well, this statute doesn't say mentally ill. Well, this court actually focuses on an even narrower subset there. So here, whatever mentally ill must mean, it must mean someone who's been found to be mentally ill by a court. And what the statute – Does it mean everyone who's ever been committed to a mental institution is today mentally ill? Well, the way that the Supreme Court – Do you think the government could carry its burden of establishing that? So there has to be some framework for evaluating what the Supreme Court meant when it said mentally ill. It has to – That's not an answer to the question. Common sense just says the answer to that's probably no. Common sense says that not everybody who has ever been involuntarily committed may be at every moment experiencing symptoms of mental illness. But as to the question of whether someone has been found mentally ill, here there's been an adjudication of mental illness. And beyond that, that adjudication was in a proceeding where, under all proper procedural requirements, someone was found to be so mentally ill, experiencing such acute mental disturbance, that an involuntary commitment was ordered. And here, to be clear, the statute that Congress crafted doesn't focus on anybody who's ever had a mental health episode. It doesn't even focus on people who've sought mental health treatment voluntarily. Congress is focused on that very narrow slice of that population that has been adjudicated mentally ill and involuntarily committed for medical treatment. It's pretty unfair to this plaintiff, right? It's very unfair. If it's true, what he says. So this plaintiff's concern is that something in the way that the Second Amendment was construed in Heller somehow invalidates the original determination of mental illness. And nothing in Heller tells us that. But you're not sort of facing the difference. I mean, I grant you all of the stuff about courts and all, although in reality the mental health systems of all the different states, a lot of times the only way you get into an institution where everybody wants you to be for a little bit is through an involuntary. But past that, and at all these procedures, is then versus now. I mean, I don't doubt that there are people sitting on federal benches in this country who are barred from holding guns under this law. If you had a psychotic break when you were 18 years old and you're now 72, you would be barred under this statute, and you're trying to tell us that that's, quote, mentally ill. It's a constitutional question about what the Second Amendment requires here. And as a constitutional matter, nothing in Heller tells us that there is an expiration here. Well, it doesn't say expiration. I mean, that's the whole question, that the mentally ill or people who are mentally ill, whether in 1791 or today, what's the evidence that that encompasses people who did something or had something happen to them a long time ago? Well, the evidence is the finding. So a plaintiff's position is that somehow after a court finds someone to be mentally ill and involuntarily commits them, there's some unspecified point in the future at which that determination becomes stale or expires, that the state needs to revisit that. Your position is that it never does. Our position is that the Constitution doesn't require revisiting. So under a plaintiff's framework, at some unspecified point in the future, if that determination becomes stale, the state needs to revisit it. It's not clear if that's 1 year, 5 years, 10 years, 20 years, 30 years, whatever amount of time that is. But then if the state, for whatever reason, declines to revisit that, then somehow a federal... The state declines to, though, but it's a federal right. It is a federal right, Your Honor, but here Congress has left it for the state that put the determination of mental illness onto the person. Is that correct? In other words, if Mr. Tyler moved to Florida, does he have to go back to Michigan? If Florida has a program, query, if Florida has a program to avoid, to reject the disability, and he moves to Florida and passes that, can he have the gun in Florida? No, he would have to go... So the way that the scheme works is that Congress leaves it up to the state that put the determination as to whether the person is still mentally ill. So if Mr. Tyler were to move to a different state... So it is... And the reason why that is, Your Honor, there are a couple of different reasons. So first, the original... In that sense, it makes it almost even odder. You have a bunch of teenagers that take LSD in North Dakota, and 40 years later, and they go crazy and get committed for a month. And 40 years later, they're scattered all over the country. They all have to go back to North Dakota to get a reevaluation? Yes, Your Honor. Based on the way they've been living in Florida and California? Yes, and there are a couple of different reasons why that makes sense. So the way that the gun control is structured, and this is reflected in the legislative history of the act, is part of the concern that Congress had was to avoid the circumvention of state laws, people passing state lines, and essentially forum shopping. So under your model, if different states have different... Different states do have different programs. They have different requirements. So under that model, that would just basically be forum shopping. Well, you know, but that's a situation that Congress created. I mean, the federal statute, in its original form, completely avoids that problem. That's true, Your Honor. So the federal statute didn't provide any remedy at all originally for individuals in Mr. Tyler's position. Now, at this point, it's up to the state, and in this case... Well, actually, do you mean that the procedure that Congress has defunded was not in the original statute? The procedure that Congress defunded did not extend to people who were covered by 922G4 in the original statute. So when the statute was originally enacted, there was a relief. But then it did. It was changed. I mean, so at the time Congress defunded it, it was not some sort of a local. I mean, it applied to people who were covered by 922G4, and so they had recourse. I mean, there was an overall statutory scheme that, you know, I mean, we're not required to decide whether that was constitutional or not, but at least it tried to take into account the fact that the prohibition was likely overbroad and that individuals needed some recourse to determine whether they fell within a proper category that was properly restricted under the Constitution from having a weapon. Well, Your Honor's question raises a number of points. So in emphasizing the overbreath, I think the Court's concern seems to be that Mr. Tyler has alleged that he personally would not misuse a firearm if he was given one, and there's no reason to question that assertion. But I think Mr. Tyler is mistaken in asserting that that is dispositive to the Court's analysis because essentially what Mr. Tyler is proposing is that there needs to be some sort of perfect fit here, that because it has been a long time since his commitment, because there's reason to suppose that he personally wouldn't misuse a firearm, the scheme is somehow constitutional and valid as applies to him. If your argument is correct, the proper result would still be to remand, but you would have a burden of establishing somehow that under whatever appropriate legal standard that the overbreadth of the statute was appropriate because it was in the government's interest. There was a close enough fit between people who were mentally ill and people who have ever been committed to a mental institution to make this constitutionally appropriate, right? Well, no, Your Honor, that doesn't... Well, I mean, how can the government rely on an argument that frankly defies common sense? And ordinary human understanding in terms of who is in fact mentally ill? I mean, the government must show something to establish that this is an appropriate assumption to make. Well, so Heller uses this language of presumptive lawfulness. Now, even if the Court is going to assume that Mr. Tyler is not mentally ill, that presumptive lawfulness doesn't mean we assume the validity of something like 922G4. Presumptive lawfulness tells us that a categorical restriction has to pass muster under some standard that's less than strict scrutiny because if something is subject to strict scrutiny, it's not presumptively lawful. So here we're in the world of something less than strict scrutiny, intermediate scrutiny, but as a matter of law, intermediate scrutiny doesn't require that perfect fit. So, Your Honor, in discussing what proceedings might look on remand, it doesn't matter. The factual showing here isn't dispositive because intermediate scrutiny permits this type of overbreath. And by overbreath here, what we mean is not someone sweeping in someone... Well, you would have to justify the overbreath in some way. Well, the test for intermediate scrutiny is that it has to be substantially related to the important purpose of Congress. So here, the legislative history shows the purposes... But you have to ask, if we're going to use intermediate scrutiny, that's what you'd have to establish. And you could not establish that by just the existence of the statute. Well, here, the legislative history shows the connection. In Mr. Tyler's case, doesn't show any departure... What in the legislative history would we look to? Well, so in enacting the statute, Congress made a number of references to individuals with a history of mental disturbance. So here, we know that Congress wasn't just focused on individuals who were currently experiencing psychotic episodes or self-harming episodes, that Congress was concerned about some history of such episodes. And that's why Congress chose to piggyback on the determination of mental illness in a formal proceeding. So you're saying, in using the words, a history of, and your historical document at 16 to 18 of your brief quotes that several times in some of your supporting evidence, that that covers everything from, you know, repeated recent episodes to one episode decades ago. It does, because as a constitutional matter, there is no distinction there. There's no line. Heller doesn't suggest that these kinds of line-drawing considerations have constitutional importance. Well, but you're... Heller doesn't suggest they don't. From Heller, if we look at, and I did look at the things that you cite, where you say that the justices of the peace could lock up lunatics who were dangerous and things of that sort, I didn't see any of them that would support those words being used to cover people like Mr. Tyler. Can you point me to any that, you know, would talk about persistent, long-time disability? I mean, I read the sources that you cited, and I didn't find them. So do you have some... What would be your best indication that these historical sources would cover somebody like Mr. Tyler? It's that history is consistent with caution about accepting Mr. Tyler's position. The history here shows that there was no clear, unqualified Second Amendment right for someone who had experienced mental disturbance, and that's what Heller tells us. So Heller tells us that individuals who have been found mentally ill are, for purposes of the Second Amendment, dissimilarly situated to individuals who have never had that kind of acute mental illness. So you do quote several good sources about responsible citizens, peaceable citizens, and you're saying that in 1791, something that happened 40 years ago would render you not responsible and peaceable today, no matter what the evidence? There's certainly nothing in the historical record that points in the other direction. But the question is, when you are making exclusions based on history from the Second Amendment, kind of who has the burden of the breadth of what you're saying? That is, I appreciate the use of the words about lunatics and not peaceable and not reasonable, but if you're making the exclusion, isn't the burden on you to show how broad that exclusion is as opposed to taking the more normal view of it? Well, so this is all a pretty undeveloped area, right? So the question that this Court pointed out in its Greenough decision is that if the Court determines that something is not clearly governed by Heller's language, as in Carey, the Court looked at the Heller's language concerning felons, and it said this language is pretty clear, disposes of the Second Amendment challenge by felon, we don't need to go any further. So for all the reasons we've laid out, we think the same analysis applies to Mr. Tyler. But if the Court believes that we shouldn't assume Mr. Tyler's mental illness and we instead proceed to the Greenough framework, there the question is just whether or not something falls within the original scope of the Second Amendment. So the Court can make that determination based on a definitive showing by the government that it doesn't, but then again, in order to find that conduct definitely falls within the Second Amendment, there has to be some historical basis for that, and there isn't. And that's why here we think the District Court not inappropriately proceeded to the second step of the Greenough framework. And this is the approach that's been followed by many courts confronting post-Heller challenges, that in the face of uncertainty and incomplete or unclear guidance from the Supreme Court about the full confines of the Second Amendment right as it was originally understood, courts have said, well, we can maybe assume that the conducted issue implicates the Second Amendment, then we can proceed to the business of applying intermediate scrutiny. That doesn't necessarily require fact-finding in this case because here, as this court and other courts have noted, under intermediate scrutiny, the government's burden can be met by legislative history, scientific evidence, and sometimes by plain common sense. And there are abundant sources that are cited in the government's brief and elsewhere to show that there is a substantial relationship between the kinds of public safety concerns that were motivating Congress and restricting firearm possession. Thank you, Counsel. I think your time has expired unless my colleagues have any further questions. Thank you. Thank you, Your Honors. Briefly, Your Honors, I just want to say that under the second prong, we're certainly not asking for a perfect fit. You know, all we want to point out is that the government's interest in keeping firearms out of the hands of the mentally ill isn't helped by keeping it out of the hands of the mentally healthy. And after 30, almost 30 years of mental health, whatever, you know, as far as two years, three years, whether someone can bring a case, I would say that that person will need to bring the case at that time. For my client, under his facts, we would say that, you know, he should be able to provide or at least be able to bear the burden himself if the government's not going to do it of showing that he's mentally healthy and to be able to potentially regain his firearm rights. Unless the Court has any other questions for me, I don't have anything further. What is your plan if this guy gets remanded, does your client show to the district court that he's fit to do it or does it go to some other agency or what relief do you find? Yeah, Your Honor, there unfortunately is no other agency for him to turn to. The commitment was in Michigan, so my understanding is he would need to go through Michigan process, but it doesn't exist, and the federal government has defunded the federal process, so he can't go there. So the only thing left would be to approach the district court with evidence. I guess we would probably have to have experts who have reviewed him to be able to testify about his current mental fitness. Did you submit inóI understood that you have a number of recent reports. Were those all submitted or referenced in your complaint? Yes, yes, they were, Your Honor. I just wanted to make sure before I even brought this case that I wasn't representing a crazy person. So I had him go to a couple of doctors, and they said yes, he doesn't have any issues, and we attached those to the complaint. Those are already in the complaint, so you've put in your first round of evidence, and then it would be up to the court as to how toóI mean, the government might or might notó again, all this is hypothetical depending on our decision, but if you were back there, then the government would have to decide what kind of position they wanted to take. Okay. Thank you, counsel. That case will be submitted, and the clerk may call the next case.